UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

DANIEL ROSS,

                              **No. 6:15-cv-06472-MAT**
                Petitioner,    **DECISION AND ORDER**

        -vs-

STEVEN RACETTE,

                Respondent.

---

## I. Introduction

Daniel Ross ("Petitioner") brings this _pro_ _se_ habeas corpus petition pursuant to 28 U.S.C. § 2254 ("Section 2254"), alleging that he is being held in custody in violation of his constitutional right of access to the courts. Petitioner is incarcerated as the result of a judgment entered on August 30, 2009, in New York State Supreme Court, Monroe County (Doyle, J.), following a jury verdict convicting him of Rape in the First Degree (New York Penal Law ("P.L.") § 130.35(1)); two counts of Criminal Sexual Act in the First Degree (P.L. § 130.50(1)); and one count of Assault in the Second Degree (P.L. § 120.05(2)).

## II.  Factual Background and Procedural History

### A.    State Court Criminal Proceedings

The convictions here at issue stem from an incident on March 25, 2004, in which Petitioner and his co-defendant Shannon Campbell ("Campbell"), raped, sexually assaulted, and stabbed L.M. while she was walking home shortly after midnight from a store at

the intersection of Avenue D and North Clinton Avenue in the City of Rochester. Officers from Rochester Police Department who responded to the crime scene recovered two used condoms that Petitioner and Campbell had worn and discarded after attacking L.M. These were sent for DNA testing and, in March and August of 2008, respectively, the state database returned DNA "hits" for Campbell and Petitioner. By August 2008, both Campbell and Petitioner were incarcerated for other crimes, but in March 2004, both men had been living within one-tenth of a mile from the crime scene. Investigators from the Monroe County District Attorney's Office interviewed Campbell and Petitioner at their respective places of incarceration in August 2008; each denied participating in the attack on L.M.

Petitioner and Campbell subsequently were charged in Monroe County Indictment Number 2008-0836 filed on October 24, 2008. Petitioner's motion to suppress his unsigned, written statement to the investigators was denied. He and Campbell proceeded to a joint jury trial on May 26, 2009.

At trial, L.M. testified that as she was walking home to her apartment from the corner store at about midnight on March 25, 2004, she was approached by two black men with their faces covered; however, their nose and eye areas were exposed. The men were approximately 5'3"- and 5'8"-tall, respectively, and both appeared to be about 18 or 20 years old. They called out to her, asking if she knew a particular person and if she had any drugs or money.

When she said she did not, the shorter man came up and put a knife to her throat. The men forced her across the street while telling her, "Don't scream." (T.579). They led her to an area near the dumpsters by the Kohlman Building at 1210 North Clinton Avenue. They threw her up against a wall, and the taller man put his penis into her mouth and forced her to perform oral sex on him. Meanwhile, the shorter man acted as the look out. The shorter man then forced her to perform oral sex on him while the taller man acted as the look out. The men repeatedly told her, "Don't scream, stay still . . . or we'll kill you," as they held her down and assaulted her. (T.589, 593). The men also cut and ripped off her clothes, including her jacket, shirt, sneakers, and jeans, and tossed them aside. L.M. testified that she was naked, wearing only one sock, as they took turns vaginally raping her. (T.586-87, 589-90). Each man wore a condom during the acts of oral sex and vaginal sex. After they finished, the men threw the used condoms aside, and the shorter man began stabbing L.M. (T.590). She was stabbed three times, once each on her leg, arm, and abdomen. The men then fled the area. L.M. got up, holding herself where she had been stabbed, and she sought help at the fire station across the street.

Rochester Police Department officers responded to the crime scene, performed an investigation, and collected items of physical evidence. In particular, officers found two pools of blood; several items of clothing, including a jacket with a blood stain, a pair of

sneakers, a pair of jeans, and a shirt; a cane; and two condoms that appeared to have been "freshly placed." (T.769). According to police evidence technician Eliud Rodriguez, the first condom, collected from a muddy, wet area, "appeared to be in a newer condition" and was clean and flimsy. (T.456-58, 460). The second condom was also clean, flimsy, and "fairly new." (T.458-59, 461). Officer Rodriguez took samples from two pools of blood located at the scene.

Forensic chemist Thomas Rodwell performed testing on the condoms and found that the interior of the first condom was positive for the presence of sperm (T.616, 620), while both the interior and exterior of the second condom were positive for the presence of sperm. (T.622-25). Nancy Scibetta, Assistant Lab Director and DNA Technical Manager at the Monroe County Public Safety Laboratory, determined that the DNA profile of Petitioner matched the DNA profile obtained from the swabs of the interior of the first condom (T.711-12), and that a partial DNA profile obtained from the swabs of the exterior of the same condom matched the DNA profile obtained from the oral swab of L.M. (T.712). Scibetta opined that the "probability of randomly selecting an unrelated individual having the same DNA profile as the interior of the condom . . . and [Petitioner] is less than one in 434 billion." (T.714). She further opined that the "probability of randomly selecting an unrelated individual having the same DNA profile as

the exterior of the condom . . . and [L.M.] is less than one in 14.9 quadrillion." (T.714).

Petitioner called his mother, Mayrene King, and his sister, Cynthia Brooks, to testify in support of his alibi defense that he was with them, and various other family members, at Brooks' house on March 24th and 25th of 2004. King testified that she was playing cards on the evening of the 24th and into the early morning hours of the 25th. (T.884). Petitioner was not playing cards, and he did not leave at any point. (T.885-86). King initially testified that Petitioner never left her sight, but then stated that she did not see Petitioner after he went to bed around 11 p.m. because he was not feeling well. (T.922). King also testified she saw him at 3 a.m., when she checked on him before she left Brooks' house. (T.923). Brooks testified that during the week of March 21, 2004, she hosted parties to celebrate two family birthdays. Initially, Brooks testified that Petitioner stayed with her from Sunday to Thursday, March 25th (T.942), but she later stated that he stayed with her from Tuesday to Thursday. (T.950). On the night of Wednesday the 24th, Petitioner had vomited from drinking too much alcohol, so he laid down in the kids' bedroom, and he did not leave the house at any point before 2 a.m. on March 25th.

On June 3, 2009, the jury returned verdicts convicting Petitioner and Campbell as charged. On August 20, 2009, Petitioner and Campbell were both sentenced to aggregate prison terms of 42 years, to be followed by 5 years of post-release supervision.

On June 20, 2014, the Appellate Division, Fourth Department, of New York State Supreme Court unanimously affirmed Petitioner's judgment of conviction. People v. Ross, 118 A.D.3d 1413 (4th Dep't 2014). On September 26, 2014, the New York Court of Appeals denied leave to appeal. People v. Ross, 24 N.Y.3d 964 (2014).

## B.    The Federal Habeas Proceeding

Petitioner filed the instant habeas petition on August 5, 2015 (Dkt #1). Respondent filed his response, supporting memorandum of law, and state court records on November 16, 2015 (Dkt ##12, 13 & 14). On October 1, 2016, Petitioner filed a letter motion to hold the petition in abeyance (Dkt #21), stating that he had recently filed a motion to vacate the judgment pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10 in state court. However, Petitioner did not specify the nature of the new claim he was exhausting in the C.P.L. § 440.10. Also, somewhat confusingly, Petitioner requested permission to withdraw all of his unexhausted claims.

Respondent opposed (Dkt #22) the request for a stay, noting that he had obtained a copy of Petitioner's C.P.L. § 440.10 motion, which raised a single claim—that trial counsel was ineffective because he "failed to advise [Petitioner] as to the sentencing exposure of consecutive sentences with an aggregate total of 42 years if he was convicted after a jury trial" and thereby caused Petitioner to reject "a plea offer of a 15-year determinate term of imprisonment and five years of post-release supervision." (Dkt #23,

Ex. A). Respondent argued that Petitioner was not entitled to a stay because (1) his new claim is plainly meritless because it is untimely and does not relate back to the claims in the original petition; and (2) he has not demonstrated good cause for failing to exhaust the new claim. (See Dkt #21).

While the motion to stay was pending, Petitioner filed a motion to withdraw all unexhausted claims (Dkt #25), stating that he wished to proceed on the merits of the following four claims: (1) the evidence was legally insufficient to support a conviction on all counts because the only evidence derived entirely from DNA analysis, without any other corroborating evidence; (2) it was reversible error for the trial court to admit his unsigned written statement into evidence because it was elicited while he was in custody; (3) he did not receive the effective assistance of counsel due to trial counsel's failure to obtain expert testimony to refute the expert DNA testimony offered by the prosecution; and (4) the total aggregate sentence of 42 years was harsh and excessive and should be reduced in the interest of justice.[1] (Dkt #25).

On December 14, 2016, the Court (Geraci, J.) issued a text order (Dkt #26) stating that, based on Petitioner's representations in his motion to withdraw (Dkt #25), his motion to hold his federal habeas petition in abeyance (Dkt #21) and motion for an extension of time (Dkt #24) were moot.

On July 5, 2017, Petitioner filed a letter requesting

---

[1] These four claims were raised by appellate counsel on direct appeal.

"permission to consolidate a C.P.L. § 440.10 motion to vacate judgment whereby leave application to the Appellate Division, Fourth Department was denied[,] [t]hereby duly exhausting all state's remedies." (Dkt #27). Petitioner's letter, which appears to be a motion to amend, was not docketed as such. Nonetheless, Respondent filed a letter docketed as a reply/response (Dkt #28) on July 25, 2017, reiterating his previous arguments that Petitioner's motion to amend should be denied as futile because the claim he sought to add was untimely under the one-year statute of limitations. Petitioner filed a letter docketed as a reply (Dkt #29) on August 7, 2017, requesting permission to amend his petition to add the claim that he had recently exhausted in his C.P.L. § 440.10 motion, namely, that trial counsel was ineffective in failing to properly advise Petitioner as to the possibility of consecutive sentences, and that if he had been properly counseled, he would have accepted the 15-year plea offer. Petitioner also requested an evidentiary hearing and the appointment of counsel in regards to the proposed ineffective assistance claim. This letter (Dkt #29) was not docketed as a motion for appointment of counsel and for an evidentiary hearing.

The matter was transferred to the undersigned on March 6, 2018. For the reasons discussed herein, Petitioner's motion to amend is denied, the motion for appointment of counsel and for an evidentiary hearing is denied as moot, and the petition for a writ of habeas corpus is denied.

**III. The Motions to Amend, for an Evidentiary Hearing, and for Appointment of Counsel**

As an initial matter, the Court must address Petitioner's miscellaneous motions. First, in connection with the motion to amend, the Court must determine whether it was timely filed. A one-year statute of limitations applies to Petitioner's habeas petition. See 28 U.S.C. § 2244(d)(1). To be timely, a federal habeas corpus petition must be filed within one year of the latest of four dates. The only that has applicability here is "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review," 28 U.S.C. § 2244(d)(1)(A). Since his conviction was affirmed by the Appellate Division on June 20, 2014, and the application for leave to appeal was denied by the New York Court of Appeals on September 26, 2014, Petitioner's conviction became final 90 days later, on Friday, December 26, 2014, the date his time to seek a writ of certiorari to the United States Supreme Court expired. See Williams v. Artuz, 237 F.3d 147, 151 (2d Cir.), cert. denied, 534 U.S. 924 (2001). Petitioner was therefore required to file his petition on or before December 26, 2015.

While the claims raised in Petitioner's initial habeas petition, filed in this Court on August 5, 2015, fall well within the one-year limitations period set forth in 28 U.S.C. § 2244(d)(1), Petitioner's new ineffective assistance of trial counsel claim—filed at the earliest in this Court on October 1, 2016—does not. Although the AEDPA limitations period is statutorily

tolled during the pendency of a properly-filed application for state post-conviction relief, see 28 U.S.C. § 2244(d)(2), Petitioner did not file his C.P.L. § 440.10 motion until October 6, 2016, nearly 10 months after the limitations period had expired. "The post-conviction proceeding, however, does not start the one-year grace period to run anew." Davis v. Racette, 99 F. Supp.3d 379, 385 (E.D.N.Y. 2015) (citing, inter alia, Smith v. McGinnis, 208 F.3d 13, 16 (2d Cir. 2000) (per curiam) ("[T]he proper calculation of Section 2244(d)(2)'s tolling provision excludes time during which properly filed state relief applications are pending but does not reset the date from which the one-year statute of limitations begins to run.")).

Because Petitioner's new claim was first raised after the one-year statute of limitations expired, it may be deemed timely only if it "relates back," that is, it "arose out of the conduct, transaction, or occurrence set out–or attempted to be set out–in the original [petition]." FED. R. CIV. P. 15(c)(1)(B). A new claim does not relate back where it is supported by facts that differ in both time and type. Mayle v. Felix, 545 U.S. 644, 650 (2005). Rather, there must be "a common core of operative facts" uniting the claims. Id. at 659, 664. It  It is insufficient for a newly asserted claim to simply derive from the same "trial, conviction, or sentence" as the original claims. Id. at 662–64.

Here, as Respondent argues, there is no "common core of operative facts" linking Petitioner's new and original claims.

Petitioner's new ineffective assistance of trial counsel claim focuses on his attorney's alleged deficiencies during plea negotiations that occurred prior to trial, while the rest of Petitioner's ineffective assistance of trial counsel claims (both the presently asserted one and the withdrawn ones) concern acts and omissions of trial counsel during the trial itself. The fact that all of these claims assert some type of ineffective assistance of counsel is insufficient to warrant relation back. See, e.g., Soto v. Conway, 565 F. Supp.2d 429, 436–39 (E.D.N.Y. 2008) (claim of ineffective assistance of appellate counsel for failure to appear at oral argument does not relate back to claim of ineffective assistance appellate counsel for failure to raise a claim of ineffective assistance of trial counsel); Valerio v. Phillips, No. 02-CV-903(RJA)(VEB), 2007 WL 4191817, at *6 (W.D.N.Y. Nov. 21, 2007) (claim of ineffective assistance as to a conflict of interest and plea bargain did not relate back to claims of ineffective assistance of counsel relating to failure to object to admission of evidence and trial rulings, and failure to request certain jury instructions).

The Court notes that Petitioner does assert a claim that his sentence was harsh and excessive, and his new ineffective assistance claim focuses on his attorney's alleged omissions in counseling him about potential sentencing exposure after trial. "The fact that both claims involve the same sentence is insufficient to merit relation back." Jenkins v. Greene, 646 F.

Supp.2d 615, 621 (S.D.N.Y. 2009) (petitioner's proposed ineffective assistance of counsel claim focused on plea negotiations that occurred prior to trial, while excessive sentence claim raised in initial petition was based on the sentence itself; because proposed claim rests on facts that differ "in both time and type" from those previously asserted, relation back was not available).

Finally, Petitioner cannot avail himself of the doctrine of equitable tolling, which requires a showing that " '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." Lawrence v. Florida, 549 U.S. 327, 336 (2007). There is no indication on the record of any "extraordinary circumstances" impeding Petitioner from timely exhausting his ineffective assistance claim relating to counsel's alleged deficiencies during the plea process. Petitioner's pro se status, limited education, and ignorance of the law are not extraordinary circumstances. See Francis v. Miller, 198 F. Supp.2d 232, 235 (E.D.N.Y. 2002) (petitioner's assertions that "he has limited education, is ignorant of the law and legal procedure, lacked funds to hire another attorney, had limited access to legal assistance that was available to prisoners, and was allowed limited use of the prison law library . . . are not extraordinary circumstances that warrant equitable tolling for the extended period of delay") (citing Smith, 208 F.3d at 18 (petitioner's pro se status does not merit equitable tolling); other citations omitted).

In light of the Court's denial of Petitioner's motion to amend the petition to add his newly exhausted ineffective assistance of trial counsel claim, his motion for an evidentiary hearing to further develop the claim and for appointment of counsel in connection with the evidentiary hearing are moot, and are denied with prejudice.

## IV. Merits of the Petition's Exhausted Claims

### A. Legal Insufficiency of the Evidence

Petitioner argues, as appellate counsel did in the main brief on direct appeal, that the evidence was legally insufficient because there was no proof that the condom with DNA that matched Petitioner's DNA had been left at the scene during the commission of the crime. Appellate counsel noted that Thomas Rodwell, the forensic chemist who examined this condom, testified that there was no scientific way of determining how long the condom had been at the location where it was collected. Furthermore, appellate counsel pointed out a condom is a readily moveable object, and the trial testimony established that there were garbage dumpsters were in the immediate vicinity of the crime scene. Therefore, appellate counsel argued, because the sole piece of evidence connecting Petitioner to the crimes was a DNA match on a condom found in the vicinity of the crime scene, without any other corroborating evidence, the evidence of identity was insufficient.

On direct appeal, the Appellate Division rejected this contention, noting that "[t]he DNA sample matching [Petitioner]'s

DNA was collected from that condom, and the victim's DNA also matched a sample taken from the condom. Moreover, the victim credibly testified that she was raped by two attackers, one of whom matched [Petitioner]'s description, and testimony from police officers supported the conclusion that the condom had been recently left at the scene[.]" Ross, 118 A.D.3d at 1414 (citations omitted).

The "relevant question" for a habeas court assessing the legal sufficiency of the evidence supporting a petitioner's conviction, "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). Even when "faced with a record of historical facts that supports conflicting inferences [a court] must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. Where, as here, the state court has adjudicated the merits of a petitioner's legal insufficiency claim, an additional layer of deference is due. Coleman v. Johnson, 132 S. Ct. 2060, 2062 (2012) (per curiam). That is, a court may not grant habeas relief unless the state court applied the Jackson standard in an "objectively unreasonable" manner. Cavazos v. Smith, 132 S. Ct. 2, 7 (2011) (per curiam) (reversing circuit court's decision granting habeas petition in light of finding that it was reasonable for state court to

determine that jury's verdict was rational; circuit court had improperly re-weighed evidence and credibility of witnesses) (citing 28 U.S.C. § 2254(d)(1)).

"In considering a petition for a writ of habeas corpus based on insufficient evidence to support a criminal conviction in the state courts, a federal court must look to state law to determine the elements of the crime." <u>Green v. Abrams</u>, 984 F.2d 41, 44–45 (2d Cir. 1993) (citation omitted). There is no dispute that L.M.'s testimony provided sufficient evidence for the jury to find that someone had committed the crimes of first-degree rape, first-degree criminal sexual act (oral sodomy), and second-degree assault, either as principal or as an accomplice.[2] Petitioner's sole challenge to the sufficiency of the evidence is that the prosecution failed to establish, beyond a reasonable doubt, the identity of the individual who committed the crimes against L.M. <u>See</u> N.Y. CRIM. PROC. LAW. § 70.20 ("No conviction of an offense by verdict is valid unless based upon trial evidence which is legally sufficient and which establishes beyond a reasonable doubt every element of such offense and the Defendant's commission thereof.").

---

[2]
A person is guilty of first-degree rape under P.L. § 130.35(1) when he engages in sexual intercourse with another person "[b]y forcible compulsion[.]" A person is guilty of first-degree criminal sexual act under P.L. § 130.50(1) when he "engages in oral sexual conduct or anal sexual conduct" with another person "[b]y forcible compulsion[.]" A person is guilty of second-degree assault under P.L. § 120.05(2) when, "[w]ith intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument."

While L.M. was not able to identify Petitioner as one of her attackers, "there is no rule of law that requires identity to be established by an eyewitness" <u>United States v. Kwong</u>, 14 F.3d 189, 193 (2d Cir. 1994). Rather, "[i]dentity can be inferred through circumstantial evidence[,]" <u>id.</u>, and DNA evidence may provide that circumstantial evidentiary link. <u>See</u>, <u>e.g.</u>, <u>People v. Moss</u>, 138 A.D.3d 761, 761 (2d Dep't 2016) (finding that "[t]he evidence of defendant's identity as the perpetrator of the subject burglaries, which included DNA evidence, although circumstantial and lacking in any positive identification by the complainants, established a <u>prima facie</u> case as to identity;" viewing evidence in light most favorable to prosecution, and deferring to jury's resolution of credibility issues, evidence was legally sufficient to prove guilt beyond a reasonable doubt) (citations omitted).

"[T]here is no statutory requirement of corroboration for sexual abuse crimes predicated upon forcible compulsion and, since 1984, corroboration is no longer required on the remaining counts of sexual abuse and sodomy defined in part by the age of the victim." <u>People v. Soulia</u>, 695 N.Y.S.2d 179, 182 (3d Dep't 1999). A state could require, as a matter of state law, that there be "corroboration" of DNA evidence by other evidence, but New York has not established such a requirement. . <u>Harrison v. Walsh</u>, No. 06 CIV.13328 RMB AJP, 2007 WL 1576265, at *20 (S.D.N.Y. June 1, 2007), <u>R&R adopted</u>, No. 06 CIV.13328RMBAJP, 2007 WL 2844867 (S.D.N.Y. Sept. 27, 2007) (citations omitted). "Thus, under New York law,

'uncorroborated' DNA evidence—just like a fingerprint or any other forensic evidence linking a defendant to the crime—is sufficient to prove a defendant's guilt beyond a reasonable doubt." Id. (collecting cases).

Here, the prosecution's forensic expert testified that Petitioner's DNA profile matched the DNA profile obtained from the swabs of the first condom's interior, and that a partial DNA profile obtained from the swabs of the same condom's exterior matched the DNA profile obtained from the oral swab of L.M. The expert opined that the "probability of randomly selecting an unrelated individual having the same DNA profile as the interior of the condom . . . and [Petitioner] is less than one in 434 billion" (T.714), and that the "probability of randomly selecting an unrelated individual having the same DNA profile as the exterior of the condom . . . and [L.M.] is less than one in 14.9 quadrillion." (Id.).[3]

While L.M. was unable to identify either of her attackers, a rational jury, drawing all permissible inferences in favor of the prosecution, was entitled to find that the DNA evidence established

---

[3]
    In addition to the DNA evidence, the prosecution adduced evidence at trial that Petitioner was 22 years-old and about 5'8"- to 5'9"-tall; L.M. estimated that one of her attackers was 5'8" and the other was 5'3" and that both were 18 or 20 years-old. Also, on March 25, 2004, Petitioner was living with his sister at 5 Oscar Street, which was less than a tenth of a mile away from the crime scene; Campbell also was living within a tenth of a mile, at 1264 North Clinton Avenue; and the distance between their residences was 200 feet. Furthermore, Petitioner had no innocent explanation for the presence of his DNA on a condom found at the crime scene, since he vehemently denied ever having sexual intercourse with anyone in that area.

Petitioner's identity beyond a reasonable doubt. See, e.g., People v. Burroughs, 108 A.D.3d 1103, 1106 (4th Dep't 2013) ("Although the victim was unable to identify defendant at trial, i.e., she testified that her attacker ordered her not to look at him, the DNA evidence alone[, showing the odds that the DNA from the rape kit came from someone other than defendant were 1 in 49.9 billion,] 'established defendant's identity beyond a reasonable doubt[.]'") (quotation and citations omitted); People v. Dearmas, 48 A.D.3d 1226, 1227 (4th Dep't 2008) (evidence comparing defendant's DNA sample to DNA obtained from a hair recovered from a mask found near robbery crime scene was sufficient to support conviction for second-degree robbery, even though defendant was not identified as the masked person who robbed bank and expert was unable to identify error rate of enzyme used to conduct DNA analysis; expert testified that the chance that the DNA sample recovered from the mask was from a person other than defendant was one in 12.2 trillion).

B.   **Erroneous Admission of Custodial Statements**

Petitioner repeats his argument, raised by appellate counsel on direct appeal, that the trial court erred in deeming his written statement to be admissible notwithstanding that it was elicited while he was in custody and that he refused to sign the statement without the presence of an attorney.

The facts surrounding the obtaining of a statement from Petitioner may be summarized as follows:[4] On August 19, 2008, after receiving information from the statewide DNA databank that Petitioner might be a suspect in the March 2004 crime against L.M., Investigators Robert Siersma and Sam Soprano from the Monroe County District Attorney's Office met with Petitioner, who was then incarcerated at Livingston Correctional Facility on an unrelated conviction. After reading the <u>Miranda</u> warnings to Petitioner from a pre-printed card, Investigator Siersma asked Petitioner whether he wished to talk to the investigators about a "cold case" from 2004, Petitioner said yes.

When asked if he knew co-defendant Campbell, Petitioner said he did not. He indicated that he was living with his sister on Oscar Street at the time. Petitioner was shown a picture of the Kohlman Building, and he admitted being familiar with it. Petitioner was shown various photographs of the building and the area around it. When asked if he ever had sexual relations with a woman in the area of the Kohlman Building, specifically, in the alcove where the assault occurred, Petitioner responded in the negative, and said that he never had sex with a woman in that area. The investigators asked Petitioner if he ever had been present while someone else had engaged in sexual intercourse with a woman

---

[4]

The factual summary is based on the testimony presented at the <u>Huntley</u> hearing held on before Justice Doyle. The transcript of the <u>Huntley</u> hearing is contained in ECF No. 14-1, filed under seal by Respondent, and appears at pages through of 1245 (ECF pagination).

in that area, and he replied, no. They also asked him how a condom with his DNA on it could have come to be found near the Kohlman Building; Petitioner replied that he did not know. In short, Petitioner repeatedly denied ever raping or stabbing a woman in the area of the Kohlman Building on March 25, 2004. Investigator Siersma informed Petitioner that he was going to document his denials to the allegations, and began to handwrite a statement, in which Petitioner participated. When the statement was finished, Investigator Siersma read it aloud to Petitioner, asked him if it was accurate. Petitioner replied that, yes, it was accurate. Investigator Siersma then asked him to sign it, and Petitioner said, "I don't want to do that unless my attorney is present or something to that effect." At that point, Investigator Siersma ended the conversation. Investigator Siersma noted that prior to that point in time, Petitioner had never mentioned or requested an attorney. Petitioner did not testify at the <u>Huntley</u> hearing, and the defense did not call any witnesses.

At the close of the hearing, the trial court denied the motions to suppress filed by Petitioner and co-defendant Campbell. In particular, the trial court found it was "uncontroverted that each defendant indicated they understood their rights and each indicated they agreed to waive their rights and speak with Investigator Siersma[,]" and there was "no indication that either defendant was threatened or in any way coerced to speak with [him]." The trial court rejected the proposition that the location

of the interviews, i.e., in a correctional facility, had the effect of persuading or coercing the defendants to speak.  The trial court further found that each defendant was afforded an opportunity to review the written statement, and there was "no evidence before the court that would prove that either defendant can not read or understand the written statements that were prepared by Investigator Siersma."

On direct appeal, the Appellate Division rejected Petitioner's claim concerning the admissibility of his statement to Investigator Siersma, noting that although Petitioner "was subjected to custodial interrogation when he gave his written statement to the police, it is undisputed that he had previously waived his Miranda rights. . . ." Ross, 118 A.D.3d at 1415. Therefore, the Appellate Division concluded, his statement was voluntary. Id. (citations omitted).  The Appellate Division further concluded that Petitioner's "subsequent refusal to sign the written statement did not render invalid the knowing, intelligent and voluntary nature of the statement[.]" Id. (citations omitted). The Appellate Division's holding was not an unreasonable application of clearly established Supreme Court precedent, as set forth in, e.g., Connecticut v. Barrett, 479 U.S. 523, 531 (1987).

In Barrett, the accused, while in custody on suspicion of sexual assault, was three times advised by the police of his Miranda rights. On each occasion, after signing and dating an acknowledgment that he had been given those rights, the accused,

Barrett, indicated to the police that he would not make a written statement, but that he was willing to talk about the incident that led to his arrest. Barrett, 479 U.S. at 525-26. On the second and third such occasions, he said "he was willing to talk about [the incident] verbally but he did not want to put anything in writing until his attorney came." Id. at 526 (quotation omitted). Barrett then orally admitted his involvement in the sexual assault. One of the police officers reduced to writing his recollection of Barrett's last such statement, and the confession was introduced into evidence at his trial. The trial court refused to suppress the confession, finding that Barrett had fully understood the Miranda warnings and had voluntarily waived his right to counsel, but the state appellate court reversed, finding that Barrett's expressed desire for counsel before making a written statement constituted an invocation of his right to counsel for *all* purposes, that he had not waived that right by initiating further discussion with the police, and that therefore the incriminating statement was improperly admitted into evidence. See id. at 527-28. The Supreme Court reversed.

In the present case, Petitioner essentially argues that his statement was per se involuntary because he was in a custodial setting that was inherently coercive. It is true that "Miranda conditioned the admissibility at trial of any custodial confession on warning a suspect of his rights. . . ." Missouri v. Seibert, 542 U.S. 600, 609 (2004). However, Petitioner does not dispute that he

*was* administered the <u>Miranda</u> warnings. "Once warned, the suspect is free to exercise his own volition in deciding whether or not to make a statement to the authorities." <u>Oregon v. Elstad</u>, 470 U.S. 298, 308 (1985). Again, Petitioner does not dispute that he voluntarily waived his rights under <u>Miranda</u> and agreed to speak to the investigators. The Supreme Court has observed that "giving the warnings and getting a waiver has generally produced a virtual ticket of admissibility; . . . and litigation over voluntariness tends to end with the finding of a valid waiver." <u>Seibert</u>, 542 U.S. at 608-09. Petitioner's argument that his refusal to sign the statement without the presence of an attorney rendered the statement inadmissible is foreclosed by <u>Barrett</u>, which held that a defendant can make a limited invocation of his right to counsel. <u>See</u> <u>Barrett</u>, 479 U.S. at 529 (holding that the defendant's invocation of the right to counsel, by refusing to make written statements without the presence of his attorney, was limited by its terms to the making of written statements, and did not prohibit all further discussion with police, where the defendant then agreed to make oral statement). Under <u>Barrett</u>, Petitioner's invocation of the right to counsel prior to signing the written statements did not operate retrospectively to vitiate his knowing, intelligent, voluntary decision to speak with the police. <u>See</u> <u>id.</u>; <u>see also</u> <u>id.</u> at 530 ("We reject the contention that the distinction drawn by Barrett between oral and written statements indicates an understanding of the consequences so incomplete that we should deem

his limited invocation of the right to counsel effective for all purposes."). In sum, the Appellate Division's ruling was an objectively reasonable interpretation of, and was not contrary to, clearly established federal law, as determined by the Supreme Court.

### C.    Ineffective Assistance of Trial Counsel

Petitioner argues, as he did on direct appeal, that trial counsel was ineffective "for failing to call a forensic expert DNA rebuttal witness." The Appellate Division rejected this claim, finding that Petitioner "failed to demonstrate the absence of a strategic or otherwise legitimate explanation for counsel's alleged shortcomings[.]" Ross, 118 A.D.3d at 1416 (quotations and citations omitted). The Appellate Division observed that the "record suggests that an expert was, in fact, consulted, and that defense counsel deliberately decided not to call him to testify." Id. (citation omitted).

A lawyer's representation denies a defendant his right to counsel as guaranteed by the Sixth Amendment where it (1) "falls below an objective standard of reasonableness;" and (2) there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 688, 694 (1984). To show deficient performance, the petitioner must demonstrate "that counsel made errors so serious that counsel was not functioning as

the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687. To show prejudice, the petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. However, it is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Id. at 693.       Where, as here, the state appellate court has adjudicated the petitioner's ineffective assistance claim on the merits for purposes of 28 U.S.C. § 2254(d)(1), "[t]he question 'is not whether a federal court believes the state court's determination' under the Strickland standard 'was incorrect but whether that determination was unreasonable–a substantially higher threshold.'" Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (quotation omitted). Stated another way, "[t]he question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Harrington v. Richter, 562 U.S. 86, 105 (2011).

As an initial matter, it is well settled that "[t]he decision not to call a particular witness is typically a question of trial strategy that appellate [and habeas] courts are ill-suited to second-guess." United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998) (citations omitted). Here, the record indicates that trial counsel made a tactical decision[5] to undermine the prosecution's

---

[5]

Prior to jury selection, trial counsel requested that an order authorizing payment for a forensic expert's services. (T.12-13). Trial counsel's subsequent statements show that he made a deliberate, strategic decision, after consulting with this expert, not to call him as a defense witness. (See T.14 (stating that

DNA evidence through cross-examination of the prosecution's forensic witnesses, rather than by presenting testimony from a rebuttal expert. Simply because the prosecution chose to present an expert witness did not mean that trial counsel was constitutionally required to offer expert testimony in rebuttal. "Strickland does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." Harrington, 562 U.S. at 111. As the Supreme Court observed in Harrington, often "cross-examination will be sufficient to expose defects in an expert's presentation[,]" and especially where the defense "does not have a solid case, the best strategy can be to say that there is too much doubt about the [prosecution]'s theory for a jury to convict." Id. Petitioner thus has not shown that trial counsel's strategic decision not to call the DNA expert with whom he previous consulted was outside the "'wide range' of reasonable professional assistance." Harrington, 562 U.S. at 104 (quoting Strickland, 466 U.S. at 689).

Moreover, Petitioner's assertions of prejudice are entirely speculative; he has not explained how the defense would have benefitted as the result of trial counsel calling the DNA expert as a rebuttal witness. See, e.g., Carr v. Senkowski, 2007 WL 3124624, at *21 (W.D.N.Y. Oct. 23, 2007) ("[A] petitioner does not show that

_____

he had "no intention of calling [the expert] to testify," and requesting that the court "preclude the prosecution from making any reference during the case . . . that I have, in fact, retained and have used an expert with reference to . . . the DNA material")).

he was prejudiced by trial counsel's alleged deficient performance merely by asserting that certain witnesses might have supplied relevant testimony; rather, he must state exactly what testimony they would have supplied and how such testimony would have changed the result."). Therefore, Petitioner cannot show that but for trial counsel's failure to call a DNA expert, there is a reasonable probability that the result of his trial would have been different.

### D.   Harsh and Excessive Sentence

Petitioner claims, as he did on direct appeal, that his sentence is harsh and excessive, and that he is entitled to have it reduced in the interest of justice. Petitioner requested that the Appellate Division exercise its discretionary authority under state law to review factual questions and impose a lesser term of imprisonment. On direct appeal, the Appellate Division held that Petitioner's sentence was not unduly harsh and severe. Ross, 118 A.D.3d at 1416.

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 68 (1991) (citations omitted). A habeas petitioner's claim that his sentences were excessive generally does not present constitutional questions amenable to federal habeas review. See, e.g., Bellavia v. Fogg, 613 F.2d 369, 373-74, n. 7 (2d Cir. 1979) (sentencing statute is properly the province of the state legislature and long

mandatory sentence imposed pursuant to statute did not constitute cruel and unusual punishment).

The Second Circuit has stated that no federal constitutional issue is presented where the sentence is within the range prescribed by state law. White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992) (citation omitted). Here, Petitioner was sentenced to a determinate prison term of 25 years on his conviction of first-degree rape as a principal; a concurrent determinate prison term of 25 years on his conviction of first-degree criminal sexual act as a principal; a consecutive determinate term of 10 years on his conviction of first-degree criminal sexual act as an accomplice; and a consecutive determinate prison term of 7 years on his conviction of second-degree assault. None of Petitioner's individual sentences exceeded the applicable statutory limits. Therefore, no constitutional issue is presented. See White, 969 F.2d at 1383.

In addition, to the extent Petitioner challenges the imposition of consecutive sentences on two of his convictions, "there is no constitutionally cognizable right to concurrent, rather than consecutive, sentences." United States v. McLean, 287 F.3d 127, 136 (2d Cir. 2002) (quotation omitted). Consequently, the question of "whether sentences should be made to run concurrently or consecutively is purely a question of state law and is not cognizable on a habeas petition." Reyes v. People, No. 08-CV-8645-GEL, 2009 WL 1066938, at *2 (S.D.N.Y. Apr. 21, 2009)

(citing <u>McLean</u>, 287 F.3d at 136-37). Here, there was no error of state law, much less an error of constitutional magnitude. The state court was authorized to impose a consecutive sentence for the assault conviction because, although the rape, criminal sexual act, and assault "'took place over a continuous course of activity, they constituted separate and distinct acts, and none of the completed offenses was a material element of another offense[.]'" People v. Smith, 269 A.D.2d 778, 778 (4ᵗʰ Dep't 2000) (quoting <u>People v. Boyce</u>, 133 A.D.3d 164, 164 (2d Dep't 1987) (citing N.Y. PENAL LAW § 70.25(2) ("When more than one sentence of imprisonment is imposed on a person for two or more offenses committed through a single act or omission, or through an act or omission which in itself constituted one of the offenses and also was a material element of the other, the sentences, except if one or more of such sentences is for a violation of section 270.20 of this chapter, must run concurrently.")). These claims are dismissed as non-cognizable in this Section 2254 proceeding.

## V. Conclusion

For the reasons stated above, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed. The motion to amend is denied with prejudice, and the motion for an evidentiary hearing and for appointment of counsel are denied as moot in light of the denial of the motion to amend. Because Petitioner has failed to make a

substantial showing of a denial of a constitutional right, the Court declines to issue a certificate of appealability. <u>See</u> 28 U.S.C. § 2253.

**SO ORDERED.**

S/Michael A. Telesca

_____

HONORABLE MICHAEL A. TELESCA
United States District Judge

Dated:    April 6, 2018
          Rochester, New York.